

Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Morton Denlow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 2813 | **DATE** | 12/16/2003 |
| **CASE TITLE** | Wendy Crespo vs. Unum Life Insurance Company of America | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Enter Memorandum Opinion and Order. The Court grants the Plaintiff's motion for summary judgment and denies the Defendant's motion for summary judgment [19-1]. Status hearing is set for 1/8/04 at 10:00 a.m. to report the status of the agreement as to the amount of the judgment. The Parties are encouraged to expedite the exchange of information regarding attorney's fees and costs under Local Rule 54.3. A final judgment will be entered once all of the computations have been agreed to or decided by this Court.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| ___ | No notices required, advised in open court. | | |
| ___ | No notices required. | number of notices | **Document Number** |
| ✓ | Notices mailed by judge's staff. | DEC 1 8 2003 | |
| ___ | Notified counsel by telephone. | date docketed | |
| ___ | Docketing to mail notices. | | 29 |
| ___ | Mail AO 450 form. | docketing deputy initials | |
| ___ | Copy to judge/magistrate judge. | 12/16/2003 | |
| DK | courtroom deputy's initials | date mailed notice | |
| | | DK6 | |
| | Date/time received in central Clerk's Office | mailing deputy initials | |

U.S. DISTRICT COURT
CLERK
03 DEC 16 PM 8:42
01 03-C

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

DEC 1 8 2003

WENDY CRESPO,  )
 )
 Plaintiff,  )
 )
 )  Case No. 03 C 2813
 )
 v.  )
 )  Magistrate Judge Morton Denlow
 )
 )
UNUM LIFE INSURANCE  )
COMPANY OF AMERICA,  )
 )
 Defendant.  )

## MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

Wendy Crespo ("Crespo" or "Plaintiff") seeks judicial review of the final decision of

Unum Life Insurance Company of America ("Unum" or "Defendant"), denying her long term

disability insurance benefits under a group policy issued to her employer, with its employees

as beneficiaries. This matter comes before the Court on cross-motions for summary

judgment and presents the issue of whether Unum was arbitrary and capricious in denying

Crespo's claim for long term disability benefits. For the reasons stated herein, the Court

finds that Unum's decision to deny Crespo's claim was arbitrary and capricious because its

assessment of her claim was neither full nor fair. The Court therefore grants Crespo's motion

for summary judgment and denies Unum's motion for summary judgment.



## II. BACKGROUND FACTS

### A.    THE PLAINTIFF: WENDY CRESPO

Crespo, a resident of Evanston, Illinois,[1] was employed from September 27, 1999, to

October 30, 2001, as a "Case Law, Senior Editor" by LEXIS-NEXIS, a division of Reed-

Elsevier, Inc.  R. 274, 366.  In her position, Crespo created summaries of legal opinions

found on the LEXIS-NEXIS database.  R. 336.  Crespo's position at LEXIS-NEXIS was

classified as sedentary, requiring occasional lifting of up to ten pounds, frequent reaching and

handling, typing, and sitting up to two-thirds of the time.  R. 100.  Qualifications for the

position included: a J.D. degree, experience as a Case Law Editor, excellent writing skills,

and proficiency in computer-based word processing.  R. 366.

### B.    PROCEDURAL HISTORY

As an employment benefit, Crespo was insured under a long term disability insurance

policy underwritten by Unum.  R. 318-55.  On October 30, 2001, Crespo ceased working at

LEXIS-NEXIS.  R. 456.  Crespo claims that she is disabled and unable to return to work as

a result of severe pain and fatigue caused by fibromyalgia.[2]  Crespo filed her application for

---

[1]Before moving to Evanston in August 2001, Crespo resided in Michigan.

[2]Fibromyalgia, "also known as fibrositis[, is] a common, but elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features. Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principle symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and—the only symptom that discriminates between it and other diseases of a rheumatic character—multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to

2

short term and long term disability benefits in December 2001. R. 50. On March 22, 2002, Unum approved and began paying short term disability benefits to Crespo. Payments were made for Crespo's six month eligibility period from October 31, 2001, to May 5, 2002, minus a one-week elimination period. R. 454-56.

After interviewing Crespo over the telephone, assembling Crespo's medical records, and performing a review of Crespo's file, Unum denied her application for long term disability benefits on July 1, 2002. R. 404-08, 434-36. Crespo appealed Unum's decision on September 17, 2002. R. 86-92. On November 21, 2002, Unum affirmed the denial of benefits. R. 69-74, 381-84. Crespo submitted her final appeal to Unum on December 12, 2002. R. 15-60. On December 26, 2002, Unum denied Crespo's final appeal. R. 373-75.

Crespo filed the instant lawsuit on April 25, 2003. The case is before the Court on cross-motions for summary judgment. The record before the Court consists of the Unum administrative record compiled by Unum in reviewing Crespo's claim. R. 1-493. On February 28, 2003, the Social Security Administration approved Crespo's claim for disability insurance benefits commencing October 30, 2001. Compl., Ex. B. This decision was rendered after Unum's final decision and will not be considered by the Court in regards to the merits of Crespo's claim. *See Perlman v. Swiss Bank Corp. Comprehensive Plan*, 195 F.3d 975, 982 (7th Cir. 1999) (limiting deferential judicial review under ERISA to the

---

flinch. . . . [I]t is difficult to determine the severity of [the] condition because of the unavailability of objective clinical tests. Some people may have such a severe case of fibromyalgia as to be totally disabled from working, but most do not and the question is whether [the patient] is one in the minority." *Sarchet v. Chater*, 78 F.3d 305, 306-07 (7th Cir. 1996) (citations omitted).

information submitted to a plan's administrator). The receipt of social security benefits,

however, does reduce Crespo's measure of damages under the Policy.

## C. THE UNUM DISABILITY POLICY

The Unum Disability Policy ("the Policy") consists of thirteen sections. R. 318-55.

Pertinent sections of the Policy include the following: three different Long Term Disability

sections, one Certificate Section, and one section concerning ERISA law. *Id.*

The Unum Policy provides for the payment of long term disability benefits as a result

of "total disability," stating:

> You are disabled when *Unum determines* that:
>
> – you are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and
> – you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.
>
> After 24 months of payments, you are disabled when *Unum determines* that due to the same sickness or injury, *you are unable to perform the duties of any gainful occupation* for which you are reasonably fitted by education, training or experience.

R. 343 (italicized emphasis added; bolded emphasis in original to indicate terms defined in

the Policy's glossary). Long term disability benefits under the Unum Policy are paid upon

the expiration of the 180 day elimination period. R. 353.

4

The Certificate Section of the Policy grants to Unum the discretion to make benefit determinations and to interpret the terms and provisions of the policy:

> The policy is delivered in and is governed by the laws of the governing jurisdiction and to the extent applicable by the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments. When making a benefit determination under the policy, Unum has *discretionary authority* to determine your eligibility for benefits and to interpret the terms and provisions of the policy.

R. 347 (emphasis added). The ERISA section of the Policy expressly vests in Unum the broadest discretion permissible under ERISA:

> **DISCRETIONARY ACTS**
> In exercising its *discretionary powers* under the Plan, the Plan Administrator, and any designee (which shall include Unum as a claims fiduciary) *will have the broadest discretion permissible under ERISA* and any other applicable laws, and its decisions will constitute *final review* of your claim by the Plan. Benefits under this Plan will be paid only if the Plan Administrator or its designee (including Unum), *decides in its discretion* that the applicant is entitled to them.

R. 323 (emphasis added).

## D.   CRESPO'S MEDICAL CONDITION AND TREATMENT RECORDS

Between March 2001 and December 2002, Crespo sought treatment for various health problems, including fibromyalgia, widespread pain, sleep disorders, and allergies. As a result, Crespo was treated or examined by a number of doctors, a chiropractor, an acupuncturist, a psychologist, and a physical therapist. All the medical records from those

who treated or examined Crespo were provided to Unum in the course of its claim review. R. 1-493.

### 1. Dr. Larry Kage, Treating Physician in Michigan

On April 16, 2001, Larry Kage, M.D., completed an application for leave from work for Crespo, pursuant to the Family and Medical Leave Act of 1993. R. 52-53. Dr. Kage diagnosed Crespo with fibromyalgia, overuse tendinitis, and myositis, commencing on March 30, 2001. R. 53. Dr. Kage opined that Crespo was not "unable to perform work of any kind" but was "unable to perform any one or more of the essential functions of [her] job." R. 52. He stated that Crespo would have to take off work intermittently or work less than a full schedule because of her fibromyalgia and other conditions. R. 53.

### 2. Dr. Gerald Natzke, Treating Physician in Michigan

On June 1, 2001, Crespo visited Gerald Natzke, D.O., for an evaluation of her fibromyalgia and chronic fatigue. R. 49. Based on his review of the basic function and accountabilities to perform her job at that time, he found that she suffered from a cognitive dysfunction that would render her "slower to task and at times incapable of making complex decisions." *Id.* He advised LEXIS-NEXIS that there were specific qualifications within her job duties that "she cannot perform." *Id.* He continued to treat her for fatigue and fibromyalgia through August 30, 2001. R. 150-53.

### 3. Dr. Clark Headrick, Michigan Sleep Study

On June 5, 2001, Crespo underwent a sleep study in Flint, Michigan. R. 197-98. After the study, Clark Headrick, D.O., reported that Crespo demonstrated no obstructive sleep apnea but did have a periodic limb movement disorder. *Id.* Dr. Headrick stated that Crespo's poor sleep quality during the test may have been attributable to the unfamiliar lab setting, but the doctor could not rule out the possibility of insomnia. *Id.* Dr. Headrick noted that Crespo had periodic limb movement disorder and a history of fibromyalgia. *Id.*

### 4. Dr. David Edelberg, Primary Treating Physician in Chicago

David Edelberg, M.D., first examined Crespo on October 2, 2001. R. 247. He is Crespo's current primary treating physician. R. 36-42. Dr. Edelberg advocates the combination of traditional medications and medical treatment with alternative medicine, such as chiropractic treatment, traditional Chinese medicine, massage therapy, homeopathy, and herbal supplements. R. 18-24.

On October 19, 2001, Dr. Edelberg executed a Family Medical Leave Act certification in which he recommended a medical leave of absence because of the severe pain Crespo was experiencing. R. 54-55. After receiving test results, conducting an examination, and performing a musculoskeletal test that showed "18 of 18 trigger points [were] tender with 4.4 kg of digital pressure," he diagnosed Crespo with fibromyalgia. R. 367. On October 30, 2001, Dr. Edelberg diagnosed Crespo as suffering from fibromyalgia, profound fatigue, and a sleep disorder. R. 480. Dr. Edelberg listed symptoms of diffuse widespread muscular pain,

unrefreshing sleep, and severe fatigue. *Id.* He opined: "Because of profound fatigue and diffuse pain which is not well controlled with medications, [Crespo] is unable to perform any occupation." *Id.* Dr. Edelberg prescribed Vicodin for pain, thyroid pills for a possible underactive thyroid, Ambien for sleep, multiple vitamins, and herbal supplements. R. 239. He also recommended that she consider seeing a massage therapist, practicing yoga, and taking classical homeopathy. *Id.*

On November 26, 2002, Dr. Edelberg completed a functional capacity questionnaire regarding Crespo. R. 36-42. That questionnaire was sent to Unum, along with a letter by Dr. Edelberg and a transcription of Dr. Edelberg's voice notes concerning Crespo's condition. R. 34-42. Noting that Crespo "had 18 of 18 points positive for the condition," R. 42, he concluded that Crespo met the American Rheumatological criteria for fibromyalgia and that she fulfilled the criteria back to her first visits in his office in October 2001, R. 41. Dr. Edelberg found that she experiences constant, deep, aching pain that requires opioid analgesics, her pain constantly interferes with her attention and concentration, and she is incapable of even low stress at work. R. 39-40.

### 5. Dr. Norman Gutmann, Internal Medicine

On October 22, 2001, Norman Gutmann, M.D., of Evanston Northwestern Healthcare examined Crespo. R. 112-13. During her only visit to Dr. Gutmann, Crespo told him that she suffered from fibromyalgia, experienced headaches, and felt depressed. R. 112, 192. Dr. Gutmann's exam notes state "?Fibromyalgia." R. 112. His notes also contain the words "no

clear trigger points." *Id.* There is no indication in the record that Dr. Gutmann requested or required Crespo to schedule a follow-up visit.

### 6. Daniel Longyne, Acupuncturist

During the benefits period, Crespo also received numerous treatments for her medical condition from Daniel Longyne, P.T., an acupuncturist, beginning in October 2001. R. 158-73.

### 7. Peak Therapeutics, Ltd., Physical Therapy

Dr. Edelman referred Crespo to Peak Therapeutics, Ltd. ("Peak") for physical therapy to treat the pain and stiffness resulting from her fibromyalgia. R. 237-38. She had physical therapy in November 2001 and experienced slight relief, "but at that time she had been very painful." R. 238. Treatment was resumed in February 2002. R. 237.

### 8. Dr. Scott Kale, Rheumatologist

Scott Kale, M.D., interviewed and examined Crespo on September 17, 2002. R. 44. Dr. Kale performed a physical examination of Crespo, who tested positive for "18/18 tenderpoints." *Id.* Dr. Kale diagnosed Crespo as suffering from "classic fibromyalgia with significant alterations in her comfort and function." *Id.* Dr. Kale opined that Crespo "would have dramatic difficulties engaging in any formal work as a result of her incapacity to be a clear and alert employee for more than one to two days per week." R. 43-44.

### 9. Judith Flaxman, Ph.D., Psychologist

Judith Flaxman, Ph.D., a licensed psychologist, prepared a psychological report based upon her weekly visits with Crespo between October 18, 2002, and December 18, 2002. R. 62-68. She reported that Crespo was not able to work and was "only minimally able to engage in normal activities of daily living." *Id.* She observed that Crespo was experiencing symptoms of emotional liability and depressed mood, remarking that Crespo's mood became more depressed as her pain worsened. R. 64. According to Dr. Flaxman, Crespo's high level of pain, mental confusion, and emotional reactivity to even mild stress compromised her ability to work. R. 62.

### E. UNUM'S LONG TERM DISABILITY BENEFITS DETERMINATION

#### 1. Unum's Initial Claim Review and Denial

Unum approved Crespo's short term disability benefits claim on March 22, 2002, for benefits from November 7, 2001, through May 5, 2002. R. 454-56. On December 19, 2001, Crespo filed a claim for long term disability benefits, alleging an onset of disability since October 2001 because of fibromyalgia. R. 436, 478-83. After the March 22, 2002, approval of Crespo's short term disability benefits claim, Unum began reviewing Crespo's long term benefits claim. On April 25, 2002, a customer care specialist, Kerry Parkhurst ("Parkhurst"), interviewed Crespo by telephone to discuss her long term disability claim. R. 434-36. On May 30, 2002, Crespo sent Unum a letter in which she listed her medical treaters, chiropractic treaters, acupuncturists, and physical therapists to assist Unum to gather records

10

for review. R. 189-93. Unum obtained the complete records of Crespo's medical treatment, education, vocational background, and employment history.

After compiling the necessary medical information, Unum completed a file review performed by Joanne Girard, R.N., on June 7, 2002, and by Dr. Thomas Reeder, Unum's Vice President and Medical Director, on June 12, 2002. R. 425-26. Nurse Girard concluded that, although Crespo met the criteria for fibromyalgia, the medical records did not validate an impairment. R. 426. Dr. Reeder concluded that Crespo's "attendings do not provide any credible evidence to support diagnoses or impairment." R. 425. Neither Nurse Girard nor Dr. Reeder ever examined Crespo or contacted any of Crespo's doctors before coming to their conclusions.

On July 1, 2002, Parkhurst sent a letter to Crespo, notifying her of Unum's decision to deny long term disability benefits. R. 404-08. The denial letter acknowledged that Crespo met the American College of Rheumatology criteria for fibromyalgia by having documented eighteen of eighteen tenderpoints. R. 406. However, Unum asserted that Crespo's physicians "do not provide any credible evidence to support diagnoses or impairment" and that "[t]here is no evidence that would preclude [Crespo] from performing [her] occupation." *Id.*

### 2. Unum's Denial of Crespo's First Appeal

On September 17, 2002, Crespo appealed Unum's decision to deny her claim. R. 86-92. The initial appeal included a letter dated July 16, 2002, from Dr. Edelberg who criticized

11

Unum's decision "as one of the most frivolous denials [he] ha[s] seen in twenty-five years

of medical practice" and offered "to discuss this case with [Unum's] medical director or with

a physician familiar with pain management." *Id.* No one from Unum took Dr. Edelberg up

on his offer.

On November 18, 2002, Donna J. Carr, D.O., Unum's Vice President and Associate

Medical Director, conducted a review of Crespo's file. R. 69-71. In her report, Dr. Carr was

critical of Dr. Edelberg, his tests, the lack of an exam by either a rheumatologist or a

psychiatrist, and the lack of a specific identification of the eighteen tenderpoints. R. 70. Dr.

Carr observed that Dr. Gutmann raised a question concerning the certainty of Crespo's

fibromyalgia diagnosis. R. 70. Dr. Carr further noted that there was no evidence of a change

or worsening in Crespo's condition as of October 30, 2001, the date Crespo claimed to be

fully disabled. R. 70. Dr. Carr noted that the July 16, 2002, letter from Dr. Edelberg was not

specific and offered no new medical information as to Crespo's claim of disability resulting

from fibromyalgia. R. 69. Finally, Dr. Carr opined:

> Based on the lack of specialty care, i.e. psych evaluation and
> Rheumatological work up, the evaluation and treatment of the
> Insured is not adequate, and is not consistent with the stated
> level of pain and impairment.

R. 69. Before rendering her opinion, Dr. Carr made no effort to contact any of Crespo's

doctors to discuss their medical reports, tests, or findings.

Following Dr. Carr's review, Unum sent Crespo's attorney a letter dated November

21, 2002, affirming its denial of Crespo's claim. R. 381-84. The letter stated that Unum had

12

reviewed Crespo's complete file and had "determined that the decision to deny benefits was appropriate." R. 384. Unum included a copy of its July 1, 2002, letter denying Crespo's long term disability benefits and referred Crespo to the earlier letter "for the specific conclusions of the comprehensive medical and vocational reviews, and the rationale behind the adverse determination on [her] claim." R. 383, 404-08.

The November 21, 2002, letter also asserted that information in the file raised concerns about the "consistency and credibility of [Crespo's] reported level of pain and symptoms." R. 382. Unum determined that Crespo's reports of pain were more severe than what would be expected of fibromyalgia, and Crespo's reports of pain in her hands and feet were inconsistent with a fibromyalgia diagnosis. *Id.* Unum observed that Crespo's reported activity levels were inconsistent with her reported inability to perform the sedentary responsibilities of her position at LEXIS-NEXIS. *Id.* Finally, Unum concluded that the medical records did not substantiate an impairment level that would preclude Crespo from performing the sedentary duties of her position at LEXIS-NEXIS as of October 31, 2001. R. 381-84.

### 5. Unum's Denial of Crespo's Second Appeal

In response to Unum's November 21, 2002, denial of Crespo's first appeal, Crespo submitted additional information to Unum on December 12, 2002. R. 15-60. The information included an evaluation from a rheumatologist, Dr. Scott Kale, a functional

capacity questionnaire completed by her treating physician, Dr. Edelberg, and a psychological report from a psychologist, Judith Flaxman, Ph.D. *Id.*

On December 23, 2002, Dorothy Cady, LSCW, reviewed Dr. Flaxman's report and opined that the report contained "no evidence of a severity of symptoms of preclude [sic] work ability currently or at [October 31, 2001]." R. 12. Ms. Cady stated that Dr. Flaxman's examination of Crespo, done more than one year after Crespo's date of disability, could not validly assess Crespo's condition as of October 31, 2001. *Id.*

On December 23, 2002, Dr. Carr reviewed Crespo's newly submitted materials, including the report from Crespo's rheumatologist, Dr. Kale. R. 12. Dr. Carr acknowledged that Dr. Kale supports a diagnosis of fibromyalgia as of September 17, 2002, but she found that no new information addressed whether Crespo was disabled as a result of either fibromyalgia or chronic fatigue as of October 31, 2001. *Id.* Once again, Dr. Carr did not examine Crespo and made no effort to contact any of Crespo's treating or examining physicians or psychologist before rendering her opinion.

Unum sent Crespo's attorney a letter dated December 26, 2002, affirming the earlier decision to deny Crespo's claim for long term disability benefits. R. 373-75. Unum stated that it had reviewed Crespo's entire file. R. 374. Unum found that the new information failed to provide evidence that Crespo's condition changed or worsened as of October 30, 2001, her last day of work. *Id.* Unum determined that the Functional Capacity Questionnaire, completed by Dr. Edelberg on November 26, 2002, was irrelevant because

14

it was completed more than one year after Crespo's claimed date of disability. *Id.* Unum rejected Dr. Flaxman's report on the same grounds. *Id.* Unum notified Crespo that she had exhausted all administrative remedies. *Id.*

## III. JURISDICTION

This suit comes before this Court pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* Jurisdiction lies in this Court pursuant to 29 U.S.C. § 1132(a)(1)(B). *Exbom v. Cent. States, Southeast & Southwest Areas Health & Welfare Fund*, 900 F.2d 1138, 1140-41 (7th Cir. 1990). Venue is properly placed in the Northern District of Illinois pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391.

## IV. LEGAL STANDARDS

### A. ERISA STANDARD OF REVIEW

Congress enacted ERISA " 'to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits.' " *The Black & Decker Disability Plan v. Nord*, 123 S. Ct. 1965, 1970 (2003) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989)). "ERISA and the Secretary of Labor's regulations under the Act require a 'full and fair' assessment of claims and clear communication to the claimant of the 'specific reasons' for benefit denial." *Id.* at 1967; *see also* 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1.

Under ERISA, the judicial standard of review for benefit determinations hinges on whether the plan administrator or fiduciary has been granted discretion in making the benefit

determination. *Bruch*, 489 U.S. at 115. As a default, courts review benefit determinations under ERISA through the application of a *de novo* standard. *Id.* However, if the administrator or fiduciary is given discretionary authority to determine eligibility for benefits, the decision will be reviewed under the deferential arbitrary and capricious standard. *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 773 (7th Cir. 2003). Under the arbitrary and capricious standard, determinations will be overturned by the court only when they are "unreasonable, and not [when] merely incorrect." *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 329 (7th Cir. 2000); *see also James v. General Motors Corp.*, 230 F.3d 315, 317 (7th Cir. 2000) (stating a benefit determination will only be found arbitrary and capricious when "downright unreasonable").

Relevant factors to be considered include "the impartiality of the decisionmaking body, the complexity of the issues, the process afforded the parties, the extent to which the decisionmakers utilized the assistance of experts where necessary, and finally the soundness of the fiduciary's ratiocination." *Chalmers v. Quaker Oats Co.*, 61 F.3d 1340, 1344 (7th Cir. 1995). A plan administrator's decision will be upheld where it makes an informed judgment and articulates an explanation "that is satisfactory in light of the relevant facts, *i.e.*, one that makes a 'rational connection' between the issue to be decided, the evidence in the case, the text under consideration, and the conclusion reached." *Exbom*, 900 F.2d at 1143.

The disability insurance policy at issue grants Unum "discretionary authority" to determine benefits eligibility and to interpret the policy's terms and provisions. As a result,

16

the Court will review Unum's denial of Crespo's benefits under the arbitrary and capricious

standard.[3] *See Hightshue v. AIG Life Ins. Co.*, 135 F.3d 1144, 1147 (7th Cir. 1998) (applying

an arbitrary and capricious standard when language in a plan grants discretion).

Unum, acting as both insurer and claims fiduciary, has a possible conflict of interest.

*See id.* at 1148. Such a conflict is weighed as a factor to determine whether there is an abuse

---

[3]This Court recognizes that the court in *Bolden v. Unum Life Insurance Co. of America*, No. 02 C 6701, 2003 WL 921764, at *3 (N.D. Ill. Mar. 6, 2003), recently applied a *de novo* standard of review to a plan administrator's benefit determination under an Unum plan, citing sections and language also found in the Plan at issue in this case. The court in *Bolden* cited as "inconsistent" the language of the Certificate Section (that Unum has "discretionary authority") and the Policy itself (that "Unum determines" disability status) to reach its decision on the *de novo* standard of review. *Id.* The court reasoned that the phrase "Unum determines" would call for *de novo* review because it is insufficient to prove the granting of discretion to Unum under *Herzberger v. Standard Insurance Co.*, 205 F.3d at 331 (stating that "the presumption of plenary review is not rebutted by the plan's stating merely that benefits will be paid only if the plan administrator determines they are due"), but the phrase "discretionary authority" would be sufficient under *Herzberger* to require an arbitrary and capricious review. *Bolden*, 2003 WL 921764, at *3. The *Bolden* court then looked to a provision in the Certificate Section that established that the Policy will govern when the Certificate Section language and the Policy language conflict, and thus, found that a *de novo* review was required by the "Unum determines" language of the Policy. *Id.*

It is unclear whether the policy in *Bolden* included the governing paragraph in the present Unum Policy, as the *Bolden* court did not reference it. The ERISA section of the Policy in this case provides "Additional Summary Plan Description Information," which includes a provision for "Discretionary Acts." The "Discretionary Acts" provision, which is quoted in the main text of this opinion, explicitly gives Unum "the broadest discretion permissible under ERISA" to pay benefits only if Unum "decides in its discretion that the applicant is entitled to them." Pursuant to the Policy, an applicant is entitled to benefits if the applicant is disabled, and the applicant is disabled only if "Unum determines" that the applicant is unable to "perform the duties of any gainful occupation."

ERISA plans are contracts, *Herzberger*, 205 F.3d at 330, and contracts must be interpreted as a whole, *Beanstalk Group, Inc. v. AM Gen. Corp.*, 283 F.3d 856, 860 (7th Cir. 2002). Therefore, the Policy and the Certificate Section are neither inconsistent nor in conflict because Unum has the *discretion to determine* whether an applicant is disabled.

Furthermore, this Court recognizes that the purpose of the *Herzberger* decision is to ensure that employees are given adequate notice that the plan administrator's judgment will be "largely insulated from judicial review by reason of being discretionary." *Herzberger*, 205 F.3d at 332. The combined language of the Certificate Section and the ERISA section of the Policy use the term "discretion," or a variation thereof, five times and clearly informs the insured of Unum's discretion.

of discretion. *Bruch*, 489 U.S. at 115. The Seventh Circuit has rejected the argument that such an inherent relational conflict is sufficient to change the standard of review. *Mers v. Marriott Int'l Group Accidental Death & Dismemberment Plan*, 144 F.3d 1014, 1020 (7th Cir. 1998). The Court presumes a fiduciary acts neutrally, absent specific evidence of actual bias or a significant conflict of interest, which is not present in this case. *See Carr v. Gates Health Care Plan*, 195 F.3d 292, 296 (7th Cir. 1999).

**B.  SUMMARY JUDGMENT STANDARD**

The parties filed cross-motions for summary judgment on the issue of whether Unum properly denied Crespo's claim for long term disability benefits. Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists in situations where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), when viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-movant. *Sinkler v. Midwest Prop. Mgmt. Ltd. P'ship*, 209 F.3d 678, 682-83 (7th Cir. 2000).

Before proceeding further, the Court wishes to address the problem of reviewing ERISA benefit claims on cross-motions for summary judgment and to strongly suggest that in the future, parties consider proceeding by means of a trial on the papers under Federal

18

Rule of Civil Procedure 52(a). *See Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001) (viewing as a bench trial, to which Federal Rule of Civil Procedure 52(a) review applied, the procedure whereby a district court entered its judgment after receiving a stipulation of the facts that made up the administrative record); *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094-95 (9th Cir. 1999) (en banc) (denying cross-motions for summary judgment and remanding the case for a bench trial on the administrative record); *see also* Morton Denlow, *Trial on the Papers: An Alternative to Cross-Motions for Summary Judgment*, 46 The Federal Lawyer 30 (1999). Courts on all levels, including the United States Supreme Court in *Nord*, customarily decide ERISA benefit cases through the summary judgment process. However, the summary judgment process has the potential for a non-decision, extra litigation, additional costs, and unnecessary delay. These potential problems are eliminated by proceeding by means of a trial on the papers.

By filing cross-motions for summary judgment, parties do not waive their right to a trial on the merits. *Market St. Assocs. Ltd. P'ship v. Frey*, 941 F.2d 588, 590 (7th Cir. 1991). Each party is merely asking a court to grant it judgment without a trial but, if the judge disagrees, each wants a trial. *Miller v. LeSea Broad., Inc.*, 87 F.3d 224, 230 (7th Cir. 1996). *But see Cook Inc. v. Boston Scientific Corp.*, 333 F.3d 737, 748 (7th Cir. 2003) (finding an implied waiver to trial where the parties wanted a trial limited to the summary judgment record). Each movant individually must fulfill the requirements necessary to obtain summary judgment under Federal Rule of Civil Procedure 56. *United Transp. Union v. Ill. Cent. R.R.*,

998 F. Supp. 874, 880 (N.D. Ill. 1998). A court is not required to grant summary judgment as a matter of law for either side when faced with cross-motions for summary judgment. *See Frey*, 941 F.2d at 590 (distinguishing cross-motions for summary judgment from a trial on the papers, where a judge must enter judgment for one party). Rather, the court is to evaluate each motion on its merits, resolving factual uncertainties and drawing all reasonable inferences against the movant. *Brownlee v. City of Chicago*, 983 F. Supp. 776, 779 (N.D. Ill. 1997).

A trial on the papers process offers certain advantages over cross-motions for summary judgment. It is certain to result in a decision for one party rather than present the risk of a non-decision if the cross-motions for summary judgment are both denied. *Compare LaBarge v. Life Ins. Co. of N. Am.*, No. 00 C 0512, 2001 WL 109527, at *1 (N.D. Ill. Feb. 6, 2001) (entering findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a) based on a trial on the administrative record), *with Coles v. LaSalle Partners Inc. Disability Plan*, No. 03 C 226, 2003 WL 22400710, at *5 (N.D. Ill. Oct. 17, 2003) (denying cross-motions for summary judgment where a credibility determination between a claimant and an administrator was necessary under a *de novo* review). Given the crowded court dockets and the expense involved in briefing cross-motion for summary judgment, the denial of both motions results in further delay and expenses that is avoided by a trial on the papers. If the decision resulting from a trial on the papers is reversed on appeal, it is unnecessary to remand for a new trial, which may occur on a reversal from cross-motions for

summary judgment. *See, e.g., Frey*, 941 F.2d at 598 (reversing and remanding the case because the essential issue was one of a party's state of mind, which is not a summary judgment issue); *Glass v. Dachel*, 2 F.3d 733 (7th Cir. 1993) (reversing a grant of cross-motions for summary judgment because the trial court made a credibility determination and remanding the case).

Additionally, where an ERISA plan contains language that confers discretion to the plan administrator, a court applies the arbitrary and capricious standard of review and will disturb the benefit determination only if it is "downright unreasonable." *Carr*, 195 F.3d at 294. If this ERISA issue is reviewed in the context of summary judgment, a court must determine the reasonableness of the plan administrator while drawing all inferences in favor of the claimant. *Brenner v. Hartford Life & Accident Ins. Co.*, No. Civ. WMN-00-608, 2001 WL 224826, at *3 (D. Md. Feb. 23, 2001) (finding a question of fact exists and denying defendant's motion for summary judgment); *Higgins v. Unum Life Ins. Co. of Am.*, No. 02-CV-1842, 2003 WL 22283498, at *5 (E.D. Pa. Oct. 2, 2003) (denying defendants' motion for summary judgment on issues of whether Plaintiff is capable of working and whether defendants acted arbitrarily and capriciously). Such an exercise during cross-motions for summary judgment represent wasted effort by the parties and the court that can be avoided easily by proceeding by means of a trial on the papers. Even though under both processes judicial review is limited to the evidence that was submitted in support of the application for benefits, *Perlman*, 195 F.3d at 982, if a question of fact arises a court must deny the cross-

21

motions for summary judgment and set the case for trial. Reviewing the identical record pursuant to a Rule 52(a) trial on the papers, the same court can decide the case and resolve any fact questions. Clearly, it is more efficient to reach the same determination on the same record by skipping cross-motions for summary judgment and proceeding directly to a trial on the papers, where all possible issues can be resolved by the court.

Furthermore, a defendant's summary judgment motion is difficult to analyze in a situation where the plan administrator is given discretion. On the one hand, the court must look at the evidence in the light most favorable to the plaintiff in analyzing whether the plan administrator abused its discretion. On the other hand, the court must give deference to the administrator's decision. This constitutes complex mental gymnastics that are not necessary in a trial on the papers situation. Under a trial on the papers, the plaintiff must meet its burden of proof that the plan administrator's decision was arbitrary and capricious. For all of these reasons, the Court strongly recommends that, in the future, parties consider a trial on the papers. The Court now will return to the cross-motions for summary judgment.

## V. DISCUSSION

### A.   STATUTORY PROCEDURES AND REQUIREMENTS FOR DENIAL OF BENEFITS

ERISA sets certain minimum requirements for procedures and notification when a plan administrator denies a claim for benefits. In summary, "ERISA requires that specific reasons for denial be communicated to the claimant and that the claimant be afforded

an opportunity for 'full and fair review' by the administrator." *Halpin v. W. W. Grainger, Inc.*, 962 F.2d 685, 688 (7th Cir. 1992).

29 U.S.C. § 1133, reads as follows:

In accordance with regulations of the Secretary, every employee benefit plan shall –

> **(1)** provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
> **(2)** afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

The regulations promulgated by the Secretary require that the initial notice of a claim denial contain:

(1) The specific reason or reasons for the denial;
(2) Specific reference to pertinent plan provisions on which the denial is based;
(3) A description of any additional information necessary for the claimant to perfect the claim and an explanation of the necessity of such information; and
(4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit her claim for review.

29 C.F.R. § 2560.503-1(g)(1). These requirements guarantee that when a claimant appeals a denial to the plan administrators, she can address the determinative issues and fairly present her case. *Halpin*, 962 F.2d at 689. The requirement of subsection (3) of 29 C.F.R. § 2560.503(g)(1), to describe additional information needed and explain its relevance, enables a party "both to appreciate the fatal inadequacy of [her] claim as it stands and to

gain a meaningful review by knowing with what to supplement the record." *Wolfe v. J.C. Penney Co.*, 710 F.2d 388, 392 (7th Cir. 1983).

The regulations also require plans to provide an internal appeals process: every plan must establish and maintain a procedure by which a claimant or his duly authorized representative has a reasonable opportunity to appeal a denied claim to an appropriate named fiduciary, and under which a full and fair review of the claim and its denial may be obtained. 29 C.F.R. § 2560.503-1(h)(1). The review procedure must allow a claimant or his representative to (1) request a review upon written application to the plan; (2) review pertinent documents; and (3) submit issues and comments in writing. *Id.* § 2560.503-1(h)(2).

The regulations also require that the decision on review be made within sixty days of the appeal, or in special circumstances, within 120 days. The notice of the decision on review must include specific reasons and specific references to the pertinent plan provisions on which the decision is based. 29 C.F.R. § 2560.503-1(j)(1)-(2). The core requirements of a full and fair review include "knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of that evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision." *Brown v. Retirement Comm. of Briggs & Stratton Retirement Plan*, 797 F.2d 521, 534 (7th Cir. 1986).

**B.    UNUM'S DECISION WAS ARBITRARY AND CAPRICIOUS**

ERISA and the Secretary of Labor's regulations under the Act require "full and fair"

assessment of claims and clear communication to the claimant of the "specific reasons" for

benefit denials. 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1. Unum's denial of Crespo's

claim was arbitrary and capricious because its assessment of her claim was neither full nor

fair. *See Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 919 (7th

Cir. 2003) (reversing denial of long-term disability claim based on fibromyalgia where

Unum's denial was unreasonable).

Notwithstanding the deference to be granted to Unum's decision, this Court concludes

as a matter of law that Unum's decision was arbitrary and capricious. First, Unum did not

make a full and fair assessment of Crespo's claim because it did not contact any of her

treating physicians to discuss its concerns. Crespo's treating physicians found that she was

unable to work as a result of fibromyalgia and related pain. However, in its final rejection

dated December 26, 2002, Unum rejects Dr. Edelberg's letter and functional capacity

questionnaire dated November 26, 2003, because "it is dated more than a year subsequent

to Ms. Crespo's last day worked and, therefore, cannot be considered relevant to her

condition on or around her stated date [October 30, 2001] of disability." R. 374. Unum

knew that Dr. Edelberg had treated Crespo since October 2, 2001, but Unum made no effort

to contact Dr. Edelberg to see if his assessment had changed since he began treating her.

Similarly, Unum made no effort to contact Dr. Kage, who treated her in Michigan and who,

on April 16, 2001, found that she was unable to perform one or more essential functions of her job. Although Unum need not accord special deference to a treating physician, Unum may not refuse arbitrarily to credit Crespo's reliable evidence, including the opinions of her treating physicians. *Nord*, 123 S. Ct. at 1972; *see also Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 476 (7th Cir. 1998) (holding an administrator's failure to inquire into the skills possessed by a claimant before determining that the claimant could perform another job made the decision arbitrary and capricious); *Hess*, 274 F.3d at 462-63 (finding an examiner's failure to make a phone call to obtain a complete copy of the relevant contract to be evidence of arbitrary and capricious action).

Second, Unum did not make a full and fair assessment of Crespo's claim because it did not consider the reports from Dr. Scott Kale, a rheumatologist, and Judith Flaxman, Ph.D., a psychologist. In its second denial letter, Unum observed that, although Crespo had sought care from "fibromyalgia specialists," she "had not been referred to a board certified Rheumatologist for a thorough rheumatological evaluation, nor [given] a referral to a multidisciplinary pain clinic." R. 383. Thereafter, Dr. Kale examined Crespo and found that she was unable to work more than one or two days per week due to "classic fibromyalgia with significant alterations in her function and comfort." R. 44. In addition, Crespo submitted a psychological report from Dr. Flaxman, who diagnosed her as suffering from fibromyalgia with a secondary diagnosis of "Adjustment Disorder with Mixed Anxious and Depressed Mood." R. 63. Dr. Flaxman found that Crespo's "ability to do work related

activities is compromised by her high level of pain, her mental confusion and her emotional reactivity to even mild stressors." R. 62. Unum failed to give any credence to these reports and made no effort to contact these doctors because the reports were not prepared as of October 30, 2001. R. 374. Unum made no effort to place these reports in context to determine if they were consistent with earlier diagnoses by other doctors.

Third, Unum did not make a full and fair assessment of Crespo's claim because it relied on Dr. Gutmann's isolated reference, "?Fibromyalgia," as evidence that Crespo's own doctors disputed whether she had fibromyalgia, but did not contact Dr. Gutmann to see what his note meant. The meaning of the term "?Fibromyalgia" is known only to Dr. Gutmann, and Unum chose to use the most negative inference possible from the note. Unum's failure to contact Dr. Gutmann for clarification of what he meant by "?Fibromyalgia" resulted in an assessment that was not full and fair, especially given the fact that not one other independent doctor questioned the diagnosis. Unum's reliance on a one-sided interpretation of an ambiguous note as a basis to discount the findings of Crespo's treating physicians was arbitrary and capricious. *See Hawkins*, 326 F.3d at 919 (reversing a benefit denial where an insurer offered "nothing more than scraps to offset the evidence presented" by a claimant).

Fourth, Unum did not make a full and fair assessment of Crespo's claim because it based its decision on its own in-house doctors who never examined her and who made no effort to discuss her condition with her treating physicians. The regulations provide that a full and fair review should:

27

(iii)        Provide that, in deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment, . . . the appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment;

29 C.F.R. § 2560.503-1(h)(3)(iii), as incorporated by 29 C.F.R. § 2560.503-1(h)(4), and

(iv)        Provide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

29 C.F.R. § 2560.503-1(h)(2)(iv), as incorporated by 29 C.F.R. § 2560.503-1(h)(4). There is nothing in the record to indicate that Unum's in-house doctors have any expertise in the area of fibromyalgia or pain management. Yet, Unum did not discuss its concerns with any of Crespo's treating physicians, who found that she was unable to work as a result of fibromyalgia and related pain. *See generally Morgan v. Unum Life Ins. Co. of Am.*, 346 F.3d 1173 (8th Cir. 2003) (affirming a district court decision that Unum acted arbitrarily and capriciously in denying a plaintiff's claim based on fibromyalgia where Unum relied upon its in-house doctors when the record did not show those doctors had any expertise in dealing with fibromyalgia).

Fifth, Unum did not make a full and fair assessment of Crespo's claim because it did not refer her for an independent examination, nor did it submit her records for an independent examination. ERISA provides that insurers may, but are not required to, seek out independent medical evaluations. *Wallace v. Reliance Standard Life Ins. Co.*, 318 F.3d 723,

28

724 (7th Cir. 2003). Seeking independent expert advice is evidence of a thorough investigation, and reliance upon independent experts generally insulates the fiduciary from judicial reversal. *Hightshue*, 135 F.3d at 1148; *Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 380 (7th Cir. 1994) (holding that an insurance company made a permissible choice in relying upon independent medical consultant over claimant's physicians); *Anderson v. Operative Plasterers' & Cement Masons' Int'l Ass'n Local No. 12 Pension & Welfare Plans*, 991 F.2d 356, 358 (7th Cir. 1993) (upholding a pension fund's denial of benefits where the fund relied upon an examination conducted by an independent orthopedic surgeon). In light of the reports from Crespo's treating and consulting physicians, Unum easily could have resolved any doubts it may have had by requiring Crespo to be examined by an independent medical expert or at a minimum to have her medical records reviewed by an independent medical expert, who could contact her treating physicians to clarify any questions.

Sixth, Unum did not make a full and fair assessment of Crespo's claim because it made an adverse credibility determination without a sufficient factual basis. Unum determined, based on a review of the records and telephone conversations with Crespo, that her complaints of pain and stiffness "are in excess of what would be expected with the conditions of fibromyalgia." R. 373. Crespo was entitled to an individual assessment because the "fact that the majority of individuals suffering from fibromyalgia can work is the weakest possible evidence" that Crespo can work. *Hawkins*, 326 F.3d at 919.

29

Seventh, Unum failed to fully and fairly assess Crespo's claim because the "specific reasons" it gave for denying long term disability benefits were logically unsound. For example, Unum relies on Dr. Gutmann's recommendation of aerobic exercise as evidence that the doctor questioned whether Crespo had fibromyalgia, but at the same time, Unum offers the lack of a graded exercise program in Crespo's treatment, as evidence that her fibromyalgia diagnosis is questionable.

Another example of unsound logic in Unum's determination is its position that Crespo's daily activities, such as "walking twice a day, performing household chores, and light exercise," are inconsistent with Crespo's claim that she is unable to perform the sedentary responsibilities of her occupation as a senior case law editor. Unum again faces its own contradiction that exercise is both (1) evidence of an accurate diagnosis of fibromyalgia when part of a treatment plan, and (2) evidence that a claimant's diagnosis of fibromyalgia is questionable. Also, Unum's comparison between Crespo's daily activities and the requirements of a full-time job is misplaced. There is no evidence anywhere in the record that Crespo undertakes these activities with the regularity and structure of a full time job. Furthermore, there is no requirement on the disabled to become inert in order to avoid having their disability benefits denied. *See Hawkins*, 326 F.3d at 918 (stating that a fibromyalgia sufferer's choice to "push[] himself to engage in a certain amount of painful and fatiguing activity. . . . does not prove that he is not disabled").

The eighth reason Unum did not make a full and fair assessment of Crespo's claim can be found in *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d at 918. In *Hawkins*, the claimant was diagnosed with fibromyalgia and worked full time with the condition for seven years before stopping work and applying for total-disability benefits. 326 F.3d at 916. The insurer denied Hawkins's claim, although the company conceded that the claimant's fourteen of eighteen tenderpoints supported a diagnosis of fibromyalgia. *Id.* The insurer felt that answers given by the claimant on an "activities questionnaire" demonstrated a higher ability to work than the claimant's doctor had reported, and the insurer's medical consultant, after reviewing Hawkins' file and speaking with the claimant's doctor, concluded that Hawkins was not disabled. *Id.*

In *Hawkins*, the court dismissed the insurer's argument that, because the claimant had fibromyalgia for seven years while working, he could not be disabled without proof that the condition worsened. *Id.* at 918. The *Hawkins* court found the argument unpersuasive because "[a] desperate person might force himself to work despite an illness that everyone agreed was totally disabling." *Id.* The court concluded that a claimant should not be punished for such "heroic efforts." *Id.*

In the present case, Unum denied Crespo's claim, *inter alia*, because "there was no information in [Crespo's] file to support a change or worsening in Ms. Crespo's condition on or around her last day worked." R. 382. Unum reasoned that such evidence would be expected if Crespo's condition caused total disability. *Id. Hawkins* is analogous to this case

31

because, like the plan administrator in *Hawkins*, Unum denied long term disability benefits when Crespo fulfilled her job requirements up to her last day worked but failed to demonstrate a worsening of the fibromyalgia at or near the last day worked.

## C.    PLAINTIFF IS ENTITLED TO ATTORNEY'S FEES

Under ERISA, "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). In awarding attorney's fees to the prevailing party, the Court asks whether the losing party's position was substantially justified and taken in good faith. *Wyatt v. Unum Life Ins. Co. of Am.*, 223 F.3d 543, 548 (7th Cir. 2000). The Court finds that Unum's position was not substantially justified as itemized above and, therefore, Plaintiff is entitled to attorney's fees. *See Hess*, 274 F.3d at 464.

## D.    REMAND IS UNNECESSARY

The Court further finds that remand is unnecessary because on the record before Unum, " 'the case is so clear-cut that it would be unreasonable for Unum to deny the application for benefits on any ground.' " *Id.* (quoting *Gallo v. Amoco Corp.*, 102 F.2d 918, 923 (7th Cir. 1996)). Furthermore, Unum paid Crespo her short term disability benefits in full before denying her claim for long term benefits. Under these circumstances, the status quo is restored by requiring the continuation of benefits. *Hackett*, 315 at 776; *see also Halpin*, 962 F.2d at 697 (finding reinstatement of benefits proper where significant procedural deficiencies occurred in the plan administrator's review).

## VII. CONCLUSION

For the reasons stated above, **the Court grants the Plaintiff's motion for summary judgment and denies the Defendant's motion for summary judgment.** The Court will enter judgment in favor of Plaintiff, Wendy Crespo, and against Defendant, Unum Life Insurance Company of America for all back payments due under the disability policy, plus prejudgment interest and attorney's fees and court costs, once these amounts are computed. Unum shall continue making future payments to Plaintiff under the policy until such time as it makes an adverse determination consistent with ERISA of her entitlement to long-term disability benefits under the policy. The Court directs counsel to confer in order to assist the parties and the Court to reach an agreement as to the amount of past benefits, prejudgment interest, attorney's fees and cost to be awarded consistent with this opinion. The status of the agreement as to the amount of the judgment shall be reported at 10:00 a.m. on January 8, 2004. The parties are encouraged to expedite the exchange of information regarding attorney's fees and costs under Local Rule 54.3. A final judgment will be entered once all of the computations have been agreed to or decided by this Court.

**SO ORDERED THIS 16TH DAY OF DECEMBER 2003.**

_Morton Denlow_

**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies mailed to:**

Mark D. DeBofsky
Daley, DeBofsky & Bryant
1 North LaSalle St., Suite 3800
Chicago, IL 60602


Counsel for Plaintiff

Michael J. Smith
Michael J. Smith & Associates
39 S. LaSalle St., Suite 305
Chicago, Illinois 60603


Counsel for Defendant